FILED
HDB
2008 FEB -7 AM 10: 39
CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

8:08-CV-00260-T-2 7MSS

| | |
|---|---|
| UNITED STATES EX REL. JEFFREY R. FREDRICK, | Civil Action No. _____ |
| STATE OF FLORIDA EX REL. JEFFREY R. FREDRICK, | ~~FILED IN CAMERA AND UNDER SEAL~~ |
| Plaintiff-Relator, | Jury Trial Requested |
| v. | |
| HANGER ORTHOPEDIC GROUP, INC., and HANGER PROSTHETICS AND ORTHOTICS, INC., | |
| Defendants. | |

## COMPLAINT

1.

This is a *qui tam* action by Plaintiff-Relator Jeffrey R. Fredrick ("Relator"), for himself and on behalf of the United States and the State of Florida, to recover damages and civil penalties arising from Defendants' actions in violating the Federal False Claims Act and the Florida False Claims Act. As set forth below, Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval to federal and state healthcare programs; knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved; and conspired to defraud the federal and state governments by getting false or fraudulent claims allowed or paid.

## Jurisdiction and Venue

2.

This action arises under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the Florida False Claims Act, F.S.A. § 68.081 *et seq.*

3.

Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a), 31 U.S.C. § 3730(h), and 28 U.S.C. § 1331, in that Count I of this action arises under the laws of the United States. Supplemental jurisdiction over Count II arises under 28 U.S.C. § 1367, since that count is so related to the federal claims that they form part of the same case or controversy.

4.

Venue is proper in this district under 31 U.S.C. § 3732(a). At least one of the Defendants can be found, resides, or transacts business within the district, and many of the acts forming the basis of this action occurred within the district.

## The Parties and Related Entities

5.

Hanger Orthopedic Group, Inc. ("HOG") is a Delaware corporation with its principal office in Bethesda, Maryland. Hanger Prosthetics & Orthotics, Inc. ("HPO") is a wholly-owned subsidiary of HOG, and serves as HOG's patient care division (HOG and HPO are referred to collectively as "Hanger"). Hanger is the world's largest provider of prosthetic and orthotic products and services, with more than 600 patient-care offices in at least 45 states and the District of Columbia. In 2006, Hanger had net sales of $598.8 million. A significant portion of Hanger's revenues comes from Medicare, Medicaid,

and other government health care programs. According to Hanger's 2006 annual report, such government programs constituted 41.1% of net sales in 2006.

6.

Relator Jeffrey R. Fredrick is a licensed prosthetist-orthotist in the states of Florida and Georgia. Relator is a former chairman of the Florida Board of Orthotists and Prosthetists, the agency that licenses prosthetists and orthotists in the state of Florida. He was appointed to the Board by two separate Florida governors. In addition, Relator is a former president of the Florida Association of Orthotists and Prosthetists and of the Florida chapter of the American Academy of Orthotists and Prosthetists. Relator worked for Hanger from 1998 through October 2006, managing its branch offices in Tallahassee, Florida and Thomasville, Georgia. He is currently the president of Rehab Engineering, LLC, a company based in Valdosta, Georgia. Relator is also a former U.S. Army paratrooper, medically retired with service-connected wounds.

Significant Principles Affecting Payment for Prosthetics

7.

Hanger is the world's largest supplier of prosthetic and orthotic items and services. "Prosthetics" refers to the design, fabrication and fitting of custom-made artificial limbs. "Orthotics" refers to the design, fabrication, fitting and supervised use of custom-made braces and other devices that provide external support to treat musculoskeletal disorders.

8.

The federal government and the states reimburse suppliers of durable medical equipment, prosthetics, orthotics, and supplies ("DMEPOS"), such as Hanger, through

3

the Medicare, Medicaid, and other health care programs. However, such reimbursement is conditioned upon a number of factors, several of which are discussed below.

### Supplier Standards

9.

In order to obtain and retain Medicare billing privileges, a DMEPOS supplier such as Hanger must, among other things, comply with various supplier standards set forth in 42 C.F.R. § 424.57. *See* 42 USC § 1395m(20) (noting that "suppliers shall be required to comply [with such standards] in order to (i) furnish any item or service for which payment is made under this part; and (ii) receive or retain a provider or supplier number used to submit claims for reimbursement for any such item or service").

10.

One of these supplier standards states that a supplier:

> Must agree not to contact a beneficiary by telephone when supplying a Medicare-covered item unless one of the following applies:
> (i) The individual has given written permission to the supplier to contact them by telephone concerning the furnishing of a Medicare-covered item that is to be rented or purchased.
> (ii) The supplier has furnished a Medicare-covered item to the individual and the supplier is contacting the individual to coordinate the delivery of the item.
> (iii) If the contact concerns the furnishing of a Medicare-covered item other than a covered item already furnished to the individual, the supplier has furnished at least one covered item to the individual during the 15-month period preceding the date on which the supplier makes such contact.

42 C.F.R. § 424.57(c)(11). The purpose of this non-solicitation requirement is to prohibit suppliers from initiating contact with beneficiaries to solicit new business.

11.

In addition, the supplier standards require that a supplier "[m]ust accept returns from beneficiaries of substandard (less than full quality for the particular item) or unsuitable items (inappropriate for the beneficiary at the time it was fitted and rented or sold)." 42 C.F.R. § 424.57(c)(15).

### Medical Necessity

12.

The Medicare program only pays for items and services that are "medically necessary." The Medicaid program contains a similar principle. *See also* 42 C.F.R. § 440.230(d) (noting that state Medicaid programs may place limits on services "based on such criteria as medical necessity"). With respect to prosthetics, as well as other items of durable medical equipment, Medicare will pay for such items only upon a physician's order. Medicare Claims Processing Manual, Chapter 20, § 10.1.3. Where a patient has already received a prosthesis, Medicare will only pay for the replacement of the prosthetic device or part if the physician determines that the replacement is necessary because of a change in the physiological condition of the patient, an irreparable change in the condition of the device or part, or the necessity of substantial repairs to the device. 42 U.S.C. § 1395m(h)(1)(G)(i).

13.

Although prosthetic devices are furnished pursuant to a physician's order, physicians routinely rely on licensed prosthetists to evaluate the patient and recommend what type or level of prosthesis is most appropriate to the patient's condition and needs. A patient's functional level is identified by "K-levels," ranging from K-0 ("The patient

does not have the ability or potential to ambulate or transfer safely with or without assistance and a prosthesis does not enhance the quality of life or mobility") to K-4 ("The patient has the ability or potential for prosthetic ambulation that exceeds basic ambulation skills, exhibiting high impact, stress or energy levels. Typical of the prosthetic demands of the child, active adult or athlete"). Thus, a vigorous patient with a below-knee amputation, who intends to participate in athletic activities such as running and basketball, may be classified as a K-4, and may appropriately require a high-end prosthetic leg. Such a leg might be inappropriate, however, for an older, less athletic patient with more limited mobility needs, who might qualify as a K-2 level.

<u>Anti-Kickback Statute</u>

14.

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), makes it illegal to, among other things, offer anything of value to induce a person to order any item or service paid for under any federal health care program. Compliance with the Anti-Kickback Statute has been held to be a condition of payment under the Medicare and Medicaid programs.

<u>Hanger's Improper "Recall Clinics"</u>

15.

While manager of certain of Hanger's offices, Relator became aware that Hanger routinely used improper marketing techniques in order to solicit new business from existing or former patients. In particular, Hanger developed a strategy of holding "prosthetic recall clinics" in order to convince former patients, who had expressed no dissatisfaction with their current prostheses, of the need to upgrade to more expensive prostheses or prosthetic components.

16.

At least once a year, each of Hanger's Florida offices would contact, by telephone and/or mail, a significant portion of its current and former prosthetic patients. These patients would be invited to attend a "free clinic" at Hanger's office, where they would be evaluated by a "visiting expert." The patients were led to believe that attending the clinic might result in an improvement in their level of functionality; if patients expressed concern about cost, they would be advised that any services would be billed to their insurance provider. One or more days would be set aside for the clinic, and refreshments would be provided to the attendees, who would sign an attendance sheet. At the clinics, a high percentage of attendees would routinely be told by the "expert" that they could benefit from an upgrade to their existing prosthesis.

17.

In actuality, the "visiting expert" would simply be a Hanger staff prosthetist from a different Hanger office. For example, a staff prosthetist in the Tallahassee office might pose as the "visiting expert" at a clinic in the Panama City office, and vice versa. In general, the supposed "expert" would have no more experience or expertise than the patient's current prosthetist at the local branch, who had fitted the patient with his current prosthesis. Thus, the representation to patients that they would be evaluated by a "visiting expert" was deceptive and misleading.

18.

Moreover, the Hanger prosthetists posing as "experts" were encouraged by Hanger to recommend prosthetic upgrades for as many "qualified" patients as possible. In this regard, a "qualified" patient was one with insurance that would pay for the

upgrade – including Medicare, Medicaid, or private insurance. Uninsured patients were rarely invited to the recall clinics, and were rarely documented as needing prosthetic upgrades. This demonstrates that the purpose of the clinic was not to neutrally assess patients' functionality and clinical needs, but rather simply to increase revenues.

19.

Once the "expert" documented the purported need for an upgraded prosthesis, Hanger would prepare a prescription for the upgrade and submit it to the patient's physician. Because physicians routinely rely on prosthetists to evaluate patients' functional needs, these prescriptions were routinely approved by the physicians without any contact with the patients or any follow-up with the prosthetists. Based on this physician order, Hanger would provide the upgraded prosthesis or components and bill the patient's insurer, in many cases Medicare or Medicaid.

20.

Relator is aware that recall clinics were routinely used throughout the state of Florida, where Hanger has approximately 40 branch offices, and believes that such practice extended to Hanger locations in other states.

<u>Ethical and Legal Concerns With the Recall Clinic Process</u>.

21.

Hanger's routine use of "recall clinics" as a tool for soliciting new business presents several ethical and legal concerns. As a fundamental matter, the routine use of such clinics calls into serious question the medical necessity of the requested upgrades. As discussed above, physicians routinely rely on licensed prosthetists to evaluate a patient's functional needs, and assume that such prosthetists base their recommendations

on professional, disinterested considerations. There are, however, numerous factors which indicate that the recommendations of the "visiting experts" were <u>not</u> based on such disinterested considerations, but were rather motivated by the naked desire to increase revenues.

22.

To begin with, it must be remembered that the patients invited to the recall clinics <u>had not complained or expressed dissatisfaction</u> about their current prostheses, indicating that they perceived no need for an upgrade. Also, Hanger did not utilize recall clinics for orthotics, which involved significantly lower reimbursement than prosthetics, and did not routinely provide free evaluations or recommend upgrades for prosthetic patients who were not covered by insurance, or who had substantial account balances. This strongly indicates that Hanger viewed the recall clinics not as a means of improving patient care, but solely as a means of increasing revenues. Indeed, at the time Relator left Hanger, there was talk of increasing the use of recall clinics in order to boost revenues.

23.

Hanger's economic motivation for the recall clinics is supported by discussions between Relator and Wallis Farraday, Hanger's Market Leader for the state of Florida. Relator was advised by Mr. Farraday that prosthetic patients should have a follow-up appointment "whether they need it or not," and that Relator's failure to require such follow-up visits indicated poor prosthetic care. Mr. Farraday stated that "we can almost always find something a patient needs we can bill for during these appointments." Although this discussion concerned a somewhat different practice than the recall clinics,

9

it indicates the motivation behind Hanger's efforts to bring back prosthetic patients for further visits.

24.

Additionally, the use of the telephone to contact previous patients in an effort to generate new business would, in many if not all cases, violate the Medicare supplier standard prohibiting such telephone solicitation. *See* 42 C.F.R. § 424.57(c)(11). Although some of the patients contacted would have received a Medicare-covered item from Hanger with the previous 15 months, many of the patients would not. As to those patients, the limited exceptions to the non-solicitation standard could not possibly apply.

25.

Moreover, the routine use of recall clinics to urge upgrades on patients who had recently received prosthetics implicates another supplier standard, which provides that a supplier "[m]ust accept returns from beneficiaries of substandard (less than full quality for the particular item) or unsuitable items (inappropriate for the beneficiary at the time it was fitted and rented or sold)." 42 C.F.R. § 424.57(c)(15). It must be remembered that the patients for whom Hanger's "visiting expert" recommended an upgrade are the same patients for whom Hanger previously (and in many cases, very recently) recommended a prosthesis with different level of functionality. Absent a compelling change in the patient's physiological condition, which generally did not exist, the question arises whether the original prosthesis was substandard or unsuitable.

26.

In addition, the use of "free clinics" to induce patients to request upgrades violates the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which, among other things, prohibits the payment of remuneration to induce a person to purchase or order an item paid for under a federal health care program. The remuneration offered to patients included the provision of a "free" evaluation by a purported "expert," who would evaluate the patient's current functionality. Quite clearly, the patients who attended the clinics considered such free evaluations a valuable benefit, as they took time out of their schedule to travel to Hanger's facility for such free evaluation. It must also be noted that the invitations to the clinics were unsolicited, and were made to patients who <u>had not made any complaints</u> about their current prosthetics. In other words, these patients were not looking for upgrades until Hanger made the offer of a free evaluation by an "expert." It is thus clear that Hanger's offer was a material inducement to these patients to order an upgrade. Accordingly, the operation of the recall clinics violates the Anti-Kickback Statute.

27.

As a result of Hanger's activities outlined above, numerous claims for prosthetic upgrades were submitted to the federal government and the states, through the Medicare and Medicaid program and other federal healthcare programs.

## COUNT I
## FEDERAL FALSE CLAIMS ACT

28.

The allegations in the preceding paragraphs are incorporated by reference.

29.

Defendants violated the Federal False Claims Act in that they:

(1) knowingly presented or caused to be presented numerous false claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1);

(2) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2); and

(3) conspired to defraud the Government by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3).

30.

As a result of Defendants' violations of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

## COUNT II
## FLORIDA FALSE CLAIMS ACT

31.

The allegations in the preceding paragraphs are incorporated by reference.

32.

Defendants violated the Florida False Claims Act, F.S.A. § 68.081 *et seq.*, in that they:

(1)     knowingly presented or caused to be presented numerous false claims for payment or approval to an agency in violation of F.S.A. § 68.082(2)(a);

(2)     knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by an agency in violation of F.S.A. § 68.082(2)(b); and

(3)     conspired to submit false or fraudulent claims to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid, in violation of F.S.A. § 68.082(2)(c).

33.

As a result of Defendants' violations of the Florida False Claims Act, the State of Florida has suffered damages in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of himself, the United States, and the State of Florida, prays:

(a)     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States and the State of Florida have sustained because of Defendants' actions, plus a civil penalty of between $5,500 and $11,000 for each violation of the federal and state False Claims Acts;

(b)     That Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the United States and/or the State of Florida intervene, and not less than 25 percent nor more than 30

percent of the proceeds of the action or settlement of the claim if the United States and/or the State of Florida do not intervene;

  (c) That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

  (d) That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

            Respectfully submitted,

            _/s/ G. Mark Simpson_____
            G. Mark Simpson
            Georgia Bar No. 647725
            Simpson Law Firm, LLC
            165 North Main Street
            Jonesboro, GA 30236
            (678) 610-1994
            (678) 302-8721 (fax)
            mark@marksimpsonlaw.com


            Michael A. Sullivan
            Georgia Bar No. 691431
            Finch McCranie, LLP
            225 Peachtree St., Suite 1700
            Atlanta, Georgia 30303
            (404) 658-9070
            (404) 688-0649 (fax)
            msullivan@finchmccranie.com
            Attorneys for Plaintiff-Relator